**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**  Plaintiff,  v.  **MONTREECE KINDLE,**  Defendant. | Case No. 09 CR 0687  Hon. Harry D. Leinenweber |

## MEMORANDUM OPINION AND ORDER

Defendant Montreece Kindle (hereinafter, "Kindle") moves for a judgement of acquittal pursuant to Federal Rule of Criminal Procedure 29 or, in the alternative, a new trial pursuant to Federal Rule of Criminal Procedure 33. For the reasons stated below, Defendant's motion is denied.

### I. BACKGROUND

#### A. Procedure

Defendant Montreece Kindle was arrested on August 10, 2009, along with Leslie Mayfield ("Mayfield"), Nathan Ward ("Ward"), and Dwayne White ("White"). On September 9, 2009, a grand jury charged the four defendants with (Count 1) conspiracy to possess with intent to distribute five kilograms or more of cocaine; (Count 2) attempted possession with intent to distribute five kilograms or more of cocaine; and (Count 3) possession of a firearm in

furtherance of the conspiracy to possess with intent to distribute five or more kilograms of cocaine.  The grand jury also charged Kindle with (Count 5) possession of a firearm after having been convicted of a felony.

Kindle was tried separately from the other three defendants in the case.  The trial began on May 24, 2010 and lasted three days.  On May 26 the jury returned a verdict and found Kindle guilty on all counts (Counts 1, 2, 3, and 5).  The Court set a deadline of June 29 for post-trial motions.  On June 25, Kindle filed the present motion for acquittal or a new trial, alleging that there was insufficient evidence that Kindle joined a drug distribution conspiracy or that he attempted to possess with intent to distribute drugs.  Kindle argues that if he is acquitted on these counts, then he must also be acquitted on all the weapons charges.

### B.  Evidence at Trial

#### 1.  *Testimony and Recordings of Gomez*

Agent Gomez ("Gomez") testified that he operated undercover and posed as a disgruntled drug courier in this case.  His role in the case began when a confidential informant introduced him to Mayfield in a meeting on July 23, 2009.  The meeting took place in Gomez's undercover vehicle, which was an SUV wired to record the meeting. During this first meeting, Gomez explained to Mayfield that he transported cocaine from a stash house once a month but was unhappy with the compensation he received.  He told Mayfield that

the stash house usually had 25-35 kilograms of cocaine in it when he arrived, and this was usually guarded by three people with guns. He explained that he needed a crew to help him rob the stash house, and had heard that Mayfield might be able to provide such a crew. After some further discussion on the details of the stash house, Mayfield agreed to bring a crew to meet with Gomez and plan the robbery.

On August 9, 2009, Mayfield, Kindle, Ward, and an individual known as "New York" (who was not a defendant in this case) met with Gomez in Gomez's SUV. Gomez testified that Kindle was present for the duration of this meeting, was within arm's reach at all times, paid attention to what was being said, and participated in the conversation. In addition to Gomez's testimony, the jury also listened to a recording of the conversation.

At the beginning of this meeting, Gomez repeated that he was a disgruntled drug courier looking for a crew to help him rob a stash house of 25-35 kilograms of cocaine. He explained that he received a phone call the day before a pickup letting him know to be ready the next day and another phone call twenty minutes before the pickup informing him of the location of the stash house.

Mayfield, Kindle, Ward, and New York then planned the robbery and asked Gomez detailed questions about the stash house. Gomez told them that he wanted to split the proceeds of the robbery so that each person would get one fifth of the total cocaine stolen.

Gomez answered questions regarding the number of guards in the house, whether the guards carried firearms, how long Gomez was usually in the stash house, and how Gomez would contact them when the drugs arrived at the stash house. New York explained that they would shoot the guard in charge first, they would be carrying silencers, and that they wanted Gomez to be ready to go into hiding if the robbery went badly. At one point, Gomez said "So if you guys said to me right now, hey, listen, this is way too much for you to handle -- for you guys to handle, let me know now." In response to this, Gomez testified that Kindle "shook his head no." Mayfield also shook his head no, while New York said no and Ward explained that it wasn't too much to handle, but that they wanted to get as much information as possible to ensure they were not walking into the situation blindly. At the end of this meeting, Gomez told the crew that as soon as he received the call from the stash house to be ready the next day, he would call Mayfield who in turn would call Kindle, Ward, and New York.

On the evening of August 9, after the crew left, Gomez called Mayfield, told him that the stash house had called and that the robbery was on for the next day, and told him to meet the next day in a particular parking lot. On August 10, Mayfield arrived in the parking lot in a brown van driven by Ward, with Kindle in the passenger seat. Mayfield got out of the van and into Gomez's SUV. Gomez then drove out of the parking lot and led the van to a

storage facility.  At the storage facility, everyone got out of their vehicles and met in a semicircle.  Gomez discovered at this time that New York was absent, and in his place was White.  Gomez then asked White if he knew why they were there, what they were going to do, and whether he was ready to do it.  White responded in the affirmative.  Gomez then asked Kindle if he was good, to which Kindle replied yes.  At this point, Gomez gave the arrest signal and Mayfield, Kindle, Ward, and White were arrested.

### 2. *Testimony of Heiserman, Rotunno, Stemmet, and Labno*

Agent Heiserman ("Heiserman") testified about his search of the brown van that Kindle used.  Heiserman found a mask, a shotgun wrapped in a towel, and three bags in the van.  Inside of these bags, Heiserman found a .44 caliber Ruger revolver, a Glock 22 semiautomatic pistol, two masks, two bulletproof vests, and latex gloves.

Agent Rotunno testified that he searched White after the arrest and found a mask in White's pocket.

Officer Stemmet testified that he recovered a .357 magnum handgun from the rear cargo area of Gomez's vehicle the day after the arrest.  No one noticed the gun at the time of the arrest, but Gomez testified that when he later reviewed the video recording from the SUV, he can see that Mayfield threw the gun into the cargo area when Gomez was not looking.  After Gomez's testimony about the video, the jury watched the video themselves.

Agent Labno ("Labno") testified to his knowledge of illegal narcotics, including his training and undercover experience. Labno testified that a kilogram of cocaine had a market price of between $27,000 and $29,000 in August 2009. Labno also testified that any amount of cocaine over an ounce is typically for distribution, and not personal use. In particular, Labno stated that a kilogram or more is consistent with distribution by a drug dealer and not consumption by a drug user.

### 3. *Testimony of Karcesky*

Agent Karcesky ("Karcesky") was responsible for interviewing Kindle after he was arrested. Karcesky testified that Kindle provided a fairly full explanation of the incident. Kindle's statements corroborated much of the other testimony in this case and also provided a few new details that were unknown to law enforcement. The corroboration is unnecessary to review, as it simply added to the weight of other testimony, but the new details are worth describing. Mayfield contacted Kindle about driving down to Naperville to meet a drug courier about a robbery. After this meeting on August 9, Mayfield said that he, Ward, and New York would storm into the stash house after Gomez knocked on the door, shoot the three guards, take the cocaine, and leave while Kindle waited in the van as the getaway driver. Kindle overheard the other three discuss guns after the meeting, but Kindle did not participate in this conversation or hear details. Kindle explained

that after they met Gomez on August 9, Mayfield stayed in Naperville while Kindle, Ward, and New York went back home until they received a call from Mayfield to return on August 10. They could not contact New York, so White replaced him even though Kindle did not know White prior to August 10. Kindle, Ward, and White then drove to Naperville and picked up Mayfield before meeting with Gomez.

## II. **LEGAL STANDARD**

Federal Rule of Criminal Procedure 29 states that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." "[A] judgment of acquittal should only be granted if the evidence, looked at in the government's favor, is so scant that the jury could only speculate as to the defendant's guilt, and a reasonably minded jury must have had a reasonable doubt as to the defendant's guilt." *United States v. Howard*, 179 F.3d 539, 542 (7th Cir. 1999). "A defendant's burden in showing the evidence was insufficient to support a conviction is 'nearly insurmountable.' We view the evidence in the light most favorable to the government and will overturn a conviction 'only if the record contains no evidence, regardless of how it is weighed,' from which the jury could have found the defendant was guilty." *United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008) (citations omitted).

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."

### III. ANALYSIS

#### A. Acquittal

Defendant moves for an acquittal because he alleges that there was insufficient evidence at trial for a jury to convict him on any of his charges.

##### 1. Count 1

The jury found Defendant guilty on Count 1, which charged him with a conspiracy to possess with intent to distribute cocaine. Defendant's argument on this count is two pronged: the government failed to prove that Defendant joined the conspiracy, and failed to prove that the conspiracy involved drug distribution.

"Conspiracy is agreement to violate some other law." *United States v. Bartlett*, 567 F.3d 901, 905 (7th Cir. 2009). The government must prove that Defendant knew the illegal objective of the conspiracy, and knowingly and intentionally agreed to participate. *Id.* at 810-11. "Though it might seem odd, the fact that the stash house, the drugs -- indeed the whole plot -- was fake is irrelevant. That the crime agreed upon was in fact impossible to commit is no defense to the crime of conspiracy." *United States v. Corson*, 579 F.3d 804, 810 (7th Cir. 2009).

Defendant argues that he merely showed up at two meetings with Gomez and that there was no evidence of an agreement between himself and Mayfield, Ward, White, or New York to rob the drug stash house. The record does not support Defendant's argument. First, there was sufficient evidence that Defendant knew the illegal objective of the conspiracy. Defendant traveled to Naperville with Ward and New York to meet with Mayfield, who told all three that he had a "lick" (meaning a robbery). Defendant was told that Mayfield knew a drug courier and that with the courier's help they were going to rob a drug stash house. Defendant then met with Gomez and discussed the robbery, including details such as the layout of the stash house, how many kilograms of cocaine were inside, and how many armed guards were present.

Second, there was also sufficient evidence that Defendant knowingly and intentionally agreed to participate. Gomez testified that Defendant actively participated in the conversation on August 9, and asked questions such as: "How long do you be in the house from the time you get there until the time you leave?" (asking Gomez how long it took him to pick up the cocaine shipment); "Most important thing, most important thing, man, the guarantee we need out of you, how many motha fuckers are going to be in the crib" (asking Gomez for a guarantee on the number of guards in the stash house); "But they not gonna let you get on no phone and all" (verifying that there was no way for Gomez to signal

the crew from inside the stash house); and "Do he ever have anything in his hand? Like a pistol? Does he ever answer the door with a pistol in his hand?" (asking how the guard answering the door is armed). Gomez asked the crew if the robbery was too much to handle, and testified that Defendant shook his head "no."

After this meeting, Defendant met with Mayfield, Ward, and New York and discussed how the robbery would be executed. Mayfield said that he wanted the stash house stormed and the guards "took out," and Defendant repeatedly told Karcesky that he knew his role was to act as the getaway driver. The jury could also infer Defendant's agreement to participate when he returned to Naperville the next day when the robbery was to take place, with Ward, White, and equipment for armed robbery. When Defendant met with Gomez to review the robbery plan again, Gomez asked the crew if they were "good" for the robbery, to which Defendant replied yes. This evidence was sufficient for a jury to find that Defendant joined the conspiracy.

Defendant's second line of argument is that the conspiracy did not include the distribution of drugs, only the theft of drugs. The evidence at trial concerning this aspect of the case included the statements made during various meetings, as well as testimony by an expert on drug transactions, Labno.

During the first meeting of the co-conspirators on August 9, New York said:

> But, uh, what I was gonna say, man, I wish I would have knew. 'Cause, you know, we buy that shit too. Ya know, we could've -- I could have been telling you. I's just tellin' him, I wish I would've knew, because I buy like that too, though.

Gomez testified that he believed New York meant that the entire crew bought and sold cocaine, and that they wish they knew he was a courier because they could have bought from him. New York went on to state that "we got a way to move it," referring to the proceeds of the robbery. Although New York was not present on August 10 when the crew was arrested, Defendant was present when New York said these things to the group and did not object or in any way indicate New York's statement was false.

During both the August 9 and August 10 meetings, Gomez told the crew that the stash house contained 25-35 kilograms of cocaine, and that this was to be split five ways. Gomez added the phrase that "everybody's going to eat." Defendant was present for these statements, and knew that he would receive five kilograms or more of cocaine out of the robbery. Labno testified that a kilogram of cocaine would be an amount far beyond what a person would have for personal use and instead is consistent with a distributional amount of cocaine. Labno explained that a person would only possess six to ten kilograms of cocaine if they were distributing it, due to risk of theft or detection by law enforcement. The references to "moving" the drugs after they were stolen, everyone receiving multiple kilograms of cocaine, and testimony that a kilogram or

more is a distributional amount provided sufficient evidence of an intent to distribute the proceeds of the stash house robbery.

Defendant's reliance on *Colon* is misplaced. In *Colon*, the Seventh Circuit held that the sale of distributional amounts of drugs, without more, cannot sustain a conspiracy conviction between the buyer and seller. *United States v. Colon*, 549 F.3d 565, 569 (7th Cir. 2008). This legal authority does not demand an acquittal in this case, as the co-defendants were not related to each other by a simple buy-sell relationship. Contrary to Defendant's characterization, this was not a crime where Gomez said he would pay the co-conspirators for the robbery in drugs, but instead it was one where the entire crew was going to share in the proceeds evenly. The co-defendants in this case reached a clear agreement to possess drugs which they all had an intent to distribute. The type of agreement in the present case, as opposed to a simple buy-sell agreement, has been the basis of a guilty verdict for a conspiracy to possess with intent to distribute in a few cases. *E.g.*, *Corson*, 579 F.3d 804; *United States v. Harris*, 570 F.Supp.2d 1030 (N.D. Ill. 2008). There was sufficient evidence to support the jury's verdict on Count 1, both in regards to Defendant joining the conspiracy and the intent to distribute the drug proceeds of the robbery.

### 2. Count 2

The jury found Defendant guilty on Count 2, which charged him with an attempt to possess with intent to distribute cocaine. Defendant did not develop an argument with respect to this count separate from the argument related to Count 1. Even if Defendant did develop an argument, there was sufficient evidence supporting the jury's verdict on this count. To prove attempt, the government had to prove that Defendant "acted with specific intent to commit the underlying offense, and in addition took a substantial step toward its completion." *United States v. Leiva*, 959 F.2d 637, 642 (7th Cir. 1992) (citation omitted). The jury heard evidence that Defendant intended to possess the cocaine in the stash house through robbery and that it was intended for distribution. They also heard that Defendant showed up on August 10 with his co-conspirators, arrived in a van with appropriate equipment for armed robbery, and was ready to commit the robbery as soon as Gomez gave them the address of the stash house. At this point, the jury could find that Defendant had taken a substantial step toward completion of the offense. The jury had sufficient evidence of guilt as to Defendant on Count 2.

### 3. Count 3 and Count 5

The jury found Defendant guilty on Count 3, which charged him with possession of a firearm in furtherance of a drug crime, specifically the crime alleged in Count 1, and found him guilty on

Count 5, which charged him with possession of a firearm by a previously convicted felon.

Defendant's first argument for acquittal on these counts is that there was no evidence that Defendant possessed a weapon at all, much less possessed a weapon in furtherance of a conspiracy. For both Counts, the government may prove either actual or constructive possession of a firearm. *United States v. Kitchen*, 57 F.3d 516, 520 (7th Cir. 1995). "Constructive possession exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *Id.* (citation omitted).

The jury heard testimony by Gomez that Defendant was present when it was discussed that the crew would have to "lay down" or shoot the guards at the stash house. Karcesky told the jury that Defendant knew Mayfield wanted the guards "took out," which Karcesky explained meant shot or killed. The jury also heard Heiserman's testimony that he found three firearms in the brown van in which Defendant traveled on August 10. In particular, the shotgun was found on the floor of the van near the middle-row seats. Gomez testified that Defendant moved to the back of the van (thereby sitting in or crossing the middle row of seats) when Mayfield stepped out of the van on August 10.

In this situation, a jury had sufficient evidence to convict Defendant on Counts 3 and 5. The jury had sufficient evidence to find that Defendant actually possessed a firearm, or constructively possessed one, given his immediate access to the firearms in the brown van. Defendant also knew that the plan was to storm a stash house with three armed guards and kill or shoot them, so it was clearly foreseeable that firearms were to be used by others to commit this offense. This evidence is sufficient to prove possession of a gun in furtherance of a drug crime under Count 3. Defendant stipulated to a prior felony conviction, so the evidence of possession alone was sufficient for Count 5.

Defendant's second argument for acquittal on these counts is that since the government did not prove the conspiracy in Count 1, the gun possession charges must fail. Since the Defendant failed to carry his burden of demonstrating insufficient evidence on which to convict him of Count 1, as detailed above, the premise of this argument fails. In addition, this argument is a non-starter in regards to Count 5, which has no dependency on Count 1 because it simply charges Defendant with possession of a firearm after being convicted of a felony.

### B. New Trial

Defendant moves for a new trial. Defendant's entire argument in support of this motion is that he "respectfully requests that this Honorable Court grant him a new trial based on all issues

raised in previously filed pre-trial motions." To the extent that this portion of the motion seeks relief on grounds separate from that discussed in the acquittal section above, it is an entirely undeveloped argument. Defendant cites to no change in circumstances or evidence since the rulings, legal mistake in the rulings, or improper application of the rulings at the time of trial. This conclusory argument is insufficient to meet the burden placed on Defendant to prove adequate grounds for relief under Rule 33. *See United States v. Fechete*, No. 06 CR 0923, 2008 U.S. Dist. LEXIS 77391 (N.D. Ill. Sept. 10, 2008).

## IV. <u>CONCLUSION</u>

For the reasons stated herein, Defendant's Motion for a New Trial or a Judgment of Acquittal is denied.

**IT IS SO ORDERED.**

　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　Harry D. Leinenweber, Judge
　　　　　　　　　　　　　　　　　　　　　United States District Court

**DATE:** 9/14/2010